IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA        :
                                :
               v.               :     CRIMINAL NO. 05-614
                                :
RICHARD T. MARIANO              :     CIVIL NO. 09-4272


<u>ORDER</u>


        AND NOW, this _____ day of _____,

2010, upon consideration of the defendant's Motion under 28

U.S.C. § 2255 to Vacate, Set Aside, or Correct the Sentence,

and the government's response thereto, it is hereby

                    O R D E R E D

that Defendant's Motion under 28 U.S.C. § 2255 to Vacate,

Set Aside, or Correct the Sentence is DENIED.

                         BY THE COURT:


                         _____
                         HONORABLE LAWRENCE F. STENGEL
                         UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 05-614 |
| | : | |
| RICHARD T. MARIANO | : | CIVIL NO. 09-4272 |

**GOVERNMENT'S RESPONSE AND MEMORANDUM IN OPPOSITION TO
<u>DEFENDANT'S PETITION UNDER 28 U.S.C. § 2255</u>**

Richard T. Mariano, currently serving a term of 78 months' imprisonment for his conviction for honest services fraud offenses, has filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence imposed by this Court on July 6, 2006.  The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, Robert A. Zauzmer, Assistant United States Attorney and Chief of Appeals, and Maria M. Carrillo, Assistant United States Attorney, submits this memorandum of law in opposition to Mariano's Section 2255 motion.

I.    **PROCEDURAL BACKGROUND**.

On October 25, 2005, a grand jury in the Eastern District of Pennsylvania returned an indictment of Richard Mariano, charging him with conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 371 (Count 1); honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346 (Counts 2 through 9); honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Counts 10 through 17); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(b)(I) (Counts 18 and 19); bribery, in violation of 18 U.S.C. § 666 (Counts 23 through 25); and filing false tax returns, in violation of 26 U.S.C.§ 7206(1) (Count 26). These charges arose out of Mariano's official actions while serving as an elected member of Philadelphia City Council which were unlawfully influenced by payments that he received from co-defendants Philip Chartock, Louis Chartock, Joseph Pellecchia, Vincent DiPentino, and Reinaldo Pastrana, all of which Mariano failed to disclose as he was required to do by law.

During pretrial proceedings, the district court determined that it would sever Mariano's case from the case

against co-defendants Philip Chartock and Louis Chartock, to avoid issues under Bruton v. United States, 391 U.S. 123 (1968), based on statements made by the Chartocks to law enforcement agents.  Mariano proceeded to trial first.

On March 17, 2006, following a two-week trial, the jury found Mariano guilty of conspiracy to commit honest services fraud (Count 1), five counts of honest services mail fraud (Counts 2, 3, 4, 5, and 8), six counts of honest services wire fraud (Counts 10, 13, 14, 15, 16, and 17), two counts of money laundering (Counts 18 and 19), three counts of bribery (Counts 23, 24, and 25), and one count of filing a false tax return (Count 26).  The jury found Mariano not guilty of two counts of honest services mail fraud (Counts 6 and 9) and two counts of honest services wire fraud (Counts 11 and 12).

On July 6, 2006, the district court held a sentencing hearing for Mariano.  The district court determined that his advisory guideline range was 78 to 97 months' imprisonment.  Mariano's range was based on an offense level for the honest services fraud and bribery offenses of 14 under U.S.S.G. § 2C1.1(a)(1).  Because

Mariano received payments of between $10,000 and $30,000, there was a four-level increase in the offense level under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(c).  Because Mariano was an elected public official, there was another four-level increase under U.S.S.G. § 2C1.1(b)(3).  Because of the related money laundering offenses, there was a two-level increase under U.S.S.G. § 2S1.1(a)(1), (b)(2)(B).  Because of Mariano's leadership role in the offense, there was another two-level increase under U.S.S.G. § 3B1.1(c).  Finally, because the offenses involved more than one bribe, there was a two-level increase under U.S.S.G. § 2C1.1(b)(1).  Mariano objected to the adjustment for more than one bribe.  After hearing argument from counsel based on the evidence introduced at trial, the district court found that Mariano's offenses involved more than one bribe and not just related payments that constituted a single incident of bribery.

On July 6, 2006, upon considering all of the 18 U.S.C. § 3553(a) factors, the Court sentenced Mariano to 78 months' imprisonment, a term of supervised release of two years, 300 hours of community service, and a special assessment of $1,800.  On July 13, 2006, Mariano filed a

timely notice of appeal.  On direct appeal to the Third Circuit Court of Appeals, Mariano claimed that: (1) there was insufficient evidence to support his convictions for honest services mail and wire fraud, and (2) this Court erred in increasing his base level by two levels pursuant to U.S.S.G. § 2C1.1(b)(1) because Erie Steel's payment to him did not involve more than one bribe.  On June 20, 2008, the Third Circuit affirmed the judgment of this Court.  Mariano did not file a petition for certiorari with the United States Supreme Court.  On September 18, 2009, Mariano timely filed his Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, Or Correct Sentence.

## II.  STATEMENT OF FACTS.[1]

The evidence presented at trial demonstrated beyond a reasonable doubt that Richard Mariano sold his office as a Philadelphia City Councilman to a number of businesspeople who made secret payments to Mariano.  In

---

[1]  The facts in this section were included in the government's brief to the Third Circuit at No. 06-3398. Upon request from the Court, the government will provide copies of the brief and appendix.

return for these corrupt payments, Mariano voted in favor of legislation providing tax benefits to Erie Steel, Ltd., the company of co-defendants Philip Chartock and Louis Chartock, and intervened on behalf of Erie Steel with, among other City agencies, the Air Management Services division of the Department of Public Health.

Mariano also promoted co-defendant Joseph Pellecchia's company, Danlin Management Group, Inc., for a workers compensation consulting contract with the Philadelphia School District.  Further, Mariano intervened on behalf of co-defendant Vincent DiPentino's companies, Century 21 DiPentino Associates and Recon International, Inc., in their efforts to obtain, among other things, certifications, licenses, compromises of certain tax, water, and sewer penalties, and properties from the City of Philadelphia.  Finally, Mariano sponsored and voted in favor of legislation to sell a city-owned property located at American and Somerset Streets for $100,000 to co-defendant Reinaldo Pastrana.

More specifically, from at least 2002 to 2005, the Chartocks sought Mariano's assistance to obtain tax breaks

for Erie Steel and other favorable treatment from various agencies of the City of Philadelphia.  The Chartocks acted illegally to secure such benefits.  They paid more than $23,000 in bribes, and, along with others who assisted in making the bribe payments, corrupted Mariano, who accepted a stream of payments with the understanding that the payments were meant to influence his official actions, and who failed to disclose these payments as he was required by law to do.

The Chartocks paid three bribes to Mariano during 2002.  Instead of taking cash or some other form of payment, Mariano received checks made payable to his credit card issuers to pay off his personal debts.  The first bribe payment occurred on May 10, 2002.  Philip Chartock gave Mariano an Erie Steel check in the amount of $5,873.75 made payable to Fleet Credit Card Service so that Mariano could pay his personal credit card bill.

Just four days prior to this first payment, officials of the Air Management Services Division of the City government sought to inspect Erie Steel to determine whether it was in compliance with the City's air pollution standards.  Instead of consenting to the inspection that

- 7 -

day, Philip Chartock successfully sought Mariano's assistance and intervention.  Mariano immediately called Department of Public Health officials to intervene on behalf of Erie Steel.  After Public Health officials determined that Erie Steel was in violation of a number of air pollution regulations, Philip Chartock used Mariano's influence to postpone for more than three years what Chartock believed would be costly corrective actions that were necessary to come into compliance with these regulations.

The second bribe payment occurred on August 26, 2002.  This time, Philip Chartock could not just give Mariano an Erie Steel check like he had before because Erie Steel's outside accountants had recently stumbled upon, and questioned the propriety of, the May 10, 2002, check that Erie Steel had written to Fleet Credit Card Service.  In an attempt to avoid further scrutiny, Philip Chartock changed the method in which he made bribe payments to Mariano.  This time, Philip Chartock – with the knowledge and approval of his father, Louis Chartock – wrote a check to William Burns, and to disguise the nature of the payment, classified the

check as a repair and maintenance expense.  Rosalia
Mattioni, who along with her husband, Joseph Pellecchia,
owned and operated Danlin Management, and who shared a joint
account with William Burns, then deposited the Erie Steel
check into her account and laundered the bribe payment by
obtaining a bank check in the amount of $6,672 made payable
to AT&T Universal Card so that Mariano could pay another one
of his personal credit card bills.

        At the time of this second payment, the Chartocks
were actively seeking Mariano's assistance in obtaining tax
relief for their business by including Erie Steel in what
was known as the Keystone Opportunity Zone ("KOZ").  On
November 13, 2002, Mariano met with Philip Chartock and
Assistant Commerce Director Vincent Dougherty to discuss tax
breaks for Erie Steel.  Even though Dougherty explained that
Erie Steel did not meet the criteria for the KOZ, the
Chartocks continued to seek Mariano's assistance.  On
November 25, 2002, Louis Chartock asked Mariano to introduce
legislation making Erie Steel eligible for KOZ tax relief.

        Just 11 days later, on December 6, 2002, Philip
Chartock made the third bribe payment.  In an attempt to

avoid scrutiny, Philip Chartock wrote an Erie Steel check to a different third party, Vincent DiPentino's company Recon International, and disguised the payment by falsely classifying it as a freight, equipment, rental expense. DiPentino deposited the Erie Steel check into his bank account and laundered the bribe payment by writing a check in the amount of $10,900 made payable to Capital One so that Mariano could pay another one of his personal credit card bills.

Having been corrupted by the stream of $23,000 in payments from the Chartocks, Mariano recommended that Erie Steel be included in new KOZ legislation making it eligible for the tax relief that the Chartocks had sought.  In January/February 2003, Mariano recommended to the City that Erie Steel be included in the tax relief legislation.  The City accepted that recommendation and included Erie Steel in a proposed tax relief bill that was introduced in City Council in April 2003.  In May 2003, Mariano twice voted in favor of the tax relief legislation, neither time disclosing his financial relationship with the Chartocks and Erie

Steel, and/or recusing himself as he was required by law to
do.

After the tax relief legislation became law, the
Chartocks sought additional favors from Mariano.  From
November 2003 to January 2005, the Chartocks repeatedly
sought to take advantage of their corrupt relationship with
Mariano by seeking his assistance with, among other things,
energy rate reductions from PECO, resolution of outstanding
tax issues, removal of a judgment against Erie Steel, and
rate reductions from the Pennsylvania Workers' Compensation
Rating Bureau.  In March 2004, Louis Chartock went so far as
to offer Mariano staffer Anna Davila money and a trip to
Florida in exchange for Davila's assistance in obtaining use
and occupancy certifications.

In the midst of this corrupt scheme, Maggie Greer,
a former Erie Steel bookkeeper who had been charged with
embezzling from Erie Steel, blew the whistle on the bribes
that had been paid to Mariano by sending anonymous letters
to the City Council President and the Mayor.  Mariano
immediately learned of the letter from the City Council
President and then, with the help of the Chartocks, devised

- 11 -

a scheme to cover up the bribes by falsely claiming that they were loans and falsely claiming that the loans had been repaid.

In May 2004, at around the same time that Mariano learned of Greer's anonymous letter and as the District Attorney's Office was preparing for the embezzlement case against Greer, the Chartocks created a fake receipt and repeatedly lied to the District Attorney's Office about their relationship with Mariano in an attempt to conceal their corrupt payments to Mariano and in an effort to continue to receive benefits from the corrupt relationship with Mariano.

In addition to his corrupt dealings with Erie Steel, the Chartocks, Pellecchia, and DiPentino, Mariano also accepted money as a reward for his sponsorship of and favorable vote on legislation through which Reinaldo Pastrana acquired a city-owned property located at American and Somerset Streets for $100,000.  This property previously had been appraised at approximately $400,000.  From 2002 to 2004, Pastrana paid more than $5,400 for three years of membership fees at the Sporting Club at the Bellevue on

behalf of Mariano, which Mariano also failed to disclose.
Pastrana made the first of the three gym membership payments
just nine days after the Mayor signed the legislation
authorizing the sale of the property.  Pastrana made the
other two payments while the process of transferring the
property from the City was still ongoing.

        In late March/early April 2005, after Mariano
learned that the FBI was investigating allegations that he
had accepted illegal payments, Mariano met with members of
his staff, including his chief of staff Walt DeTreux and his
legislative aide John Lisko, and confessed to them that he
had accepted multiple payments from Erie Steel which he had
failed to disclose.  Mariano also confessed that he had
never repaid Erie Steel any of the money that was used to
pay his personal credit card bills.  Not surprisingly,
Mariano also failed to include the more than $23,000 in
payments from Erie Steel in 2002 and the $1,800 gym
membership payment for 2002 on his 2002 federal tax return.

III. **ARGUMENT**.

A. <u>Introduction</u>.

Mariano has not filed a memorandum of law with regard to his Section 2255 petition.  Rather, he filed a "Summary of Factual and Legal Grounds for Relief," which made three assertions in summary fashion:  (1) trial counsel was ineffective in failing to discuss the possibility and possible benefits of pleading guilty, thereby depriving Mariano of the opportunity to make an informed decision regarding whether or not to plead guilty; (2) trial counsel was ineffective in failing to object to erroneous jury instructions concerning honest services fraud and bribery, and appellate counsel failed to challenge those instructions on appeal; and (3) trial and appellate counsel were ineffective in failing to move to dismiss the charges of honest services fraud, in violation of 18 U.S.C. § 1346, on the basis of unconstitutional vagueness.

The applicable legal landscape has changed significantly since Mariano filed his petition on September 18, 2009.  Notably, on June 24, 2010, the Supreme Court decided <u>Skilling v. United States</u>, 130 S. Ct. 2896

- 14 -

(2010).  The Court addressed claims that the honest services
fraud statute was unconstitutionally vague, and did not
include theories of liability advanced by the government.
The Court determined that the statute is valid, but as
drafted proscribes only schemes involving bribery or
kickbacks.

        Previously, in the Third Circuit as elsewhere, the
courts had approved what may be termed a "conflict-of-
interest" theory of honest services fraud, where an official
violates a duty of disclosure and takes official action
benefitting that undisclosed interest.  See United States v.
Panarella, 277 F.3d 678, 695 (3d Cir. 2002) ("a public
official's nondisclosure of a financial interest while
taking discretionary action that the official knows will
directly benefit that interest falls squarely within the
classical definition of fraud.").  The Skilling Court,
however, determined that the honest services statute is in
fact limited to bribery and kickback schemes, and does not
prohibit conflict-of-interest fraud.

        In the present case, with regard to the honest
services charges, the jury was charged on both bribery and

conflict-of-interest theories.  The government therefore concedes that the instructions were partly erroneous in advancing an incorrect theory of liability.  However, as will be explained, Mariano is not entitled to relief, due to the absence of prejudice.

The defendant filed his 2255 petition before Skilling was decided, and thus he has not briefed any challenge to his conviction under current law.  Thus, the government may only anticipate his argument, and present its likely rebuttal.  Should Mariano present further briefing regarding the application of Skilling to his case, the government will likely seek permission to respond.[2]

We presume that, in light of Skilling, Mariano will seek a new trial on the honest services charges as limited to the bribery allegations.  Such a claim is permissible pursuant to Section 2255.  The Supreme Court has made clear that a defendant may properly claim in a Section 2255 motion that, based on an intervening Supreme Court

_____

[2]  Mariano's petition and summary argument were filed on September 18, 2009.  Thereafter, the Court directed the government to respond.  The government ultimately sought permission to await the Skilling decision before filing its response.

decision, his conviction was for "an act that the law does
not make criminal." Davis v. United States, 417 U.S. 333,
346 (1974). See also Bousley v. United States, 523 U.S.
614, 621 (1998) ("it would be inconsistent with the
doctrinal underpinnings of habeas review to preclude
petitioner from" arguing that his conviction was
constitutionally invalid because he pleaded guilty to
conduct that was not criminal in light of a later Supreme
Court decision).  Moreover, because Skilling decriminalizes
conduct that previously had been held to constitute honest
services fraud, it applies retroactively to final criminal
convictions.  Bousley, 523 U.S. at 620-21 (Supreme Court
decisions "holding that a substantive federal criminal
statute does not reach certain conduct" apply retroactively
on collateral review).

        However, even though Mariano may present a claim,
as will be seen, his claim is ultimately defeated by settled
law applicable to the situation presented.

        At this point, Skilling renders moot the
defendant's claim that the Court's instructions regarding
conflict-of-interest honest services fraud were incorrect in

their particulars, as under current law, no instruction on that theory should have been given at all.  Skilling also resolves the substantive aspect of Mariano's claim of statutory vagueness.[3]  Presently, we presume, Mariano's arguments are:

> (1) trial counsel was ineffective in failing to discuss the possibility and possible benefits of pleading guilty, thereby depriving Mariano of the opportunity to make an informed decision regarding whether or not to plead guilty;
>
> (2) trial and appellate counsel were ineffective in failing to object to erroneous jury instructions concerning bribery; and
>
> (3) Mariano is entitled to a new trial in light of the erroneous theory of honest services liability presented to the jury.

Each of these claims fails.

> B.   Legal Standard for Ineffective Assistance of Counsel.

In Strickland v. Washington, 466 U.S. 668 (1984), The Supreme Court established a two-part test to determine whether a defendant was denied effective assistance of counsel.  Under the Strickland standard, in order to prevail

---

[3]   The Court stated:  "Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."  130 S. Ct. at 2933.

on a claim of ineffective assistance of counsel, a petitioner must establish that: (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense.  _Strickland_, 466 U.S. at 687; <u>see also United States v. Kauffman</u>, 109 F.3d 186, 190 (3d Cir. 1997).  The defendant must show both that counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," i.e., that the deficient performance prejudiced the defense.  <u>Strickland</u>, 466 U.S. at 687.

If it can be shown that counsel "made errors so serious that he was not functioning as the 'counsel' guaranteed by the Sixth Amendment," then the court must determine whether "the deficient performance prejudiced the defense."  <u>Id.</u> at 687.  Thus, in order to prove prejudice, the petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  "Failure to make the required showing of either

deficient performance or sufficient prejudice defeats the ineffectiveness claim." _Strickland_, 466 U.S. at 700. The Third Circuit has emphasized that the second part of the test, the prejudice to the defendant based on the "assumed deficient conduct of counsel," may be addressed first. <u>See</u> <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 170 (3d Cir. 1993); <u>United States v. Fulford</u>, 825 F.2d 3, 8 (3d Cir. 1987); <u>McNeil v. Cuyler</u>, 782 F.2d 443, 449 (3d Cir. 1986).

Attorney performance is to be measured by "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688. <u>Strickland</u> requires that, in assessing whether counsel was reasonably competent, "[j]udicial scrutiny of an attorney's performance must be highly deferential." As the Court stated in <u>Strickland</u>:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

<u>Id.</u> at 689.

A counsel's failure to raise meritless claims is not ineffective assistance.  <u>Oliver v. United States</u>, 961 F.2d 1339, 1342 (7th Cir. 1992).  As the Supreme Court in <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986), held, "the process of 'winnowing out weaker arguments . . . and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy."

Moreover, counsel is not ineffective in failing to raise frivolous issues.  <u>See</u> <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 169 (3d Cir. 1993).  In addition, counsel is not ineffective in failing to raise issues predicated on facts that the defendant knew at the time but did not divulge to defense counsel.  See <u>Dooley v. Petsock</u>, 816 F.2d 885 (3d Cir. 1987).

Nor is counsel ineffective simply because he overlooked a potentially successful argument.  In <u>Buehl v. Vaughn</u>, 166 F.3d 163 (3d Cir. 1999), the Third Circuit acknowledged that counsel, in a state court proceeding, had "failed to perceive at the time in question that the Buehl verdicts might be attacked as inconsistent," an argument

- 21 -

that might well have succeeded in obtaining a vacation of
the verdicts under Pennsylvania law.  The Third Circuit
found that counsel was not, however, ineffective: "a
lawyer's failure to perceive the ground for crafting an
argument that might have succeeded is very different from
the failure to meet the level of competence required by the
Sixth Amendment."  See also Jones v. Barnes, 463 U.S. 745,
750-754 (1983) (holding that appellate counsel is not
ineffective simply for failing to raise every nonfrivolous
issue on appeal).

          The burden upon Mariano to overcome the
presumption is heavy because the right to effective
assistance of counsel does not guarantee an error-free or
flawless performance by counsel.  Government of Virgin
Islands v. Bradshaw, 726 F.2d 115, 119 (3d Cir. 1984).
Mariano received a vigorous defense at trial and his
ineffective assistance of counsel claims are meritless.

     C.   Both Counsel Properly Informed Mariano as to all
          of his Options for the Resolution of the Case.

          Mariano alleges that trial counsel failed to
discuss the possibility and possible benefits of pleading
guilty, thereby depriving him of the opportunity to make an

informed decision regarding whether or not to plead guilty.
However, it is clear that Mariano was properly counseled as
to his rights to plead guilty by two experienced attorneys,
James Becker, Esquire, and Nino Tinari, Esquire.  Mr. Becker
represented Mariano pre-indictment and Mr. Tinari
represented Mariano post-indictment and at trial.  Mariano
was fully aware of all his options – and their corresponding
consequences – for the resolution of his case, and chose to
proceed to trial.  Mariano's claim of ineffectiveness by
trial counsel for failure to advise him of his right to
plead guilty should be denied.

            The Third Circuit has held that "the standard of
adequacy of legal services . . . is the exercise of the
customary skill and knowledge which normally prevails at the
time and place."  <u>United States ex rel. Caruso v. Zelinsky</u>,
689 F.2d 435, 438 (3d Cir. 1982) (quoting <u>Moore v. United
States</u>, 432 F.2d 730 (3d Cir. 1970) (en banc)).  A defendant
has a right to make a reasonably informed decision whether
to accept a plea offer and "[k]nowledge of the comparative
sentence exposure between standing trial and accepting a
plea offer will often be crucial to the decision whether to

plead guilty." United States v. Day, 969 F.2d 39, 43 (3d
Cir. 1992).  See also Caruso, 689 F.2d at 438; United States
v. Gordon, 979 F. Supp. 337, 340-41 (E.D. Pa. 1997)
("Defense lawyer's duty to assist the defendant [to] make
informed strategic choices requires the lawyer to canvass
with the defendant the advantages and disadvantages of a
guilty plea if the Government proffers a plea agreement."
(internal quotation and citation omitted) (emphasis in
original)).  Failure of an attorney to inform his or her
client of a proposed plea offer or the comparative sentence
exposure between pleading guilty and standing trial deprives
the defendant of the right to make an informed decision and
may constitute ineffective assistance of counsel.  See
Zelinsky, 689 F.2d at 438; McCoy v. United States, 96 F.
Supp. 2d 469, 478 (E.D. Pa. 2000); Gordon, 979 F. Supp. at
340-41.

        For claims regarding the assistance of counsel at
the plea bargaining stage where a defendant eventually
proceeded to trial, a habeas petitioner must establish three
components in order to demonstrate prejudice: Mariano must
prove that a plea offer was extended by the government, and

that a reasonable probability exists that he would have accepted the plea offer and the court would have approved the agreement.  United States v. Day, 969 F.2d 39, 44-45 (3d Cir. 1992).  See also United States v. Pungitore, 15 F. Supp. 2d 705, 733 (E.D. Pa. 1998).

In this case, both of Mariano's attorneys independently have informed the government that they counseled Mariano as to all of his options for the resolution of his case.  This included counseling him on his right to plead guilty, and the consequences of this choice. In addition, each defense counsel discussed with Mariano the additional options of pleading guilty and cooperating with the government, as well as proceeding to trial.

Michael Schwartz, Esquire, former Assistant United States Attorney, who was the lead prosecutor in this case, informed the government that he discussed with each defense attorney his understanding of the sentencing guideline range Mariano faced were he to plead guilty.

Accordingly, Mariano cannot prove that he was not advised of his right to plead guilty by either of his counsel.  In addition, Mariano cannot meet Strickland's

prejudice prong with regard to this claim.  He cannot show that even if he was not advised on his right to plead guilty – which the government strongly disputes – he would have accepted an offer from the government had he been so advised.  Both of his attorneys have stated that Mariano was unwavering in his desire to defend himself at trial, and clearly was not interested in other options.  His vigorous defense at trial supports this conclusion.

        We observe that Mariano has not presented any affidavit or other attestation of facts which contradicts the presumption that able counsel performed appropriately. Thus, Mariano's claim may be denied on the present record. If this Court determines that an evidentiary hearing is necessary to create a full record on this claim, the government respectfully requests that any such evidentiary hearing be limited to this issue, and that this Court deny the rest of Mariano's petition without a hearing.

    D.  **The Court's Instructions Regarding Bribery Were Correct.**

        Mariano, without providing any detail or references to the actual instructions, asserts that counsel were ineffective in failing to challenge the court's

instructions regarding bribery.  The instructions were fully

correct, and therefore Mariano's claim fails on the

prejudice prong alone.[4]

      1.  First, Mariano asserts that "the jury was not

instructed that conviction of bribery requires proof of a

*quid pro quo* exchange, and was instead permitted to convict

on a gratuity theory not charged in the indictment or argued

to the jury."  Mariano Summary at 5.  It is not clear

whether he is referring to the charge of honest services

---

[4]  Mariano also asserted particular errors in the
instructions regarding the conflict-of-interest theory of
honest services fraud, specifically, that the Court did not
adequately explain the pertinent state law of disclosure,
that the jury was not instructed that it was required to
find a violation of state criminal law, and that the jury
was allowed to find guilt based on a mere conflict-of-
interest, without any disclosure violation or discretionary
action benefitting the undisclosed interest.  Mariano
Summary at 4-5.  As stated, these claims are all moot in
light of Skilling's holding that no conflict-of-interest
theory is valid at all.  Nevertheless, we note that the
claims are frivolous, and quite surprising in light of the
explicit record.  The Court's instructions plainly complied
with the definition of the conflict-of-interest theory
approved earlier by the Third Circuit.  The Court instructed
repeatedly and at length on the elements of the theory,
advising the jury in detail of the state law regarding
disclosure, Tr. 21-24 (Mar. 16 2006), and of the requirement
that the government prove beyond a reasonable doubt that
Mariano violated this disclosure requirement and took a
discretionary action benefitting the undisclosed interest,
id. at 18, 20-21, 24-25.

bribery, or the separate charges of bribery under 18 U.S.C.

§ 666.

        The bribery instructions concerning honest

services fraud were extensive and accurate, and belie

Mariano's unsubstantiated assertion.   The court instructed

that bribery exists if the defendant:

> takes a benefit such as a payment of money or services
> or directs that such a benefit be directed to a third
> party and the official knows that the benefit is being
> given to influence him to take or withhold an official
> act.  Such conduct, accepting a benefit in exchange for
> an official act, is also referred to in the law as a
> bribe.
>
> * * *
>
> To establish such bribery, the Government must prove
> beyond a reasonable doubt that there was a quid pro
> quo, that is, that the benefit was offered in exchange
> for the official act.  The quid pro quo, however, need
> not be explicit.  The Government need prove that the
> payer explicitly stated that the money or benefit was
> in exchange for an official act.  If that were the law,
> wrongdoers could evade criminal punishment simply
> through winks and gestures.
>
> Rather, you may find the existence of an implicit quid
> pro quo without any express statement if you are
> satisfied by the evidence beyond a reasonable doubt
> that the official obtained or procured a benefit to
> which he was not entitled, knowing that the benefit was
> provided in return for official acts.  Further, where
> there is a stream of benefits given a person to favor a
> public official either directly to a official or to a
> third party whom the official favors, it need not be

shown that any specific benefit was given in exchange for a specific official act.

Tr. 18-19 (Mar. 16, 2006).

These instructions borrowed almost verbatim from statements in <u>Evans v. United States</u>, 504 U.S. 255 (1992), which stated that a quid pro quo exists where "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." <u>Id.</u> at 268. "The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." <u>Id.</u> at 274. There was certainly no error in these instructions.[5]

_____

[5]   Indeed, the same instructions proffered by the government and largely adopted by the Court in this case were also given by the district court in 2005 in the prosecution of Corey Kemp and others for honest services fraud. On appeal in the Kemp case, the Third Circuit held that the instructions were accurate, with regard to the quid pro quo requirement in general and the "stream of benefits" instruction in particular. <u>United States v. Kemp</u>, 500 F.3d 257, 281-82 (3d Cir. 2007).

Section 666 presents a different scenario.  The
statute provides:

> (a) Whoever . . . (1) being an agent of [a] local . . .
> government, or any agency thereof . . . (B) corruptly
> solicits or demands for the benefit of any person, or
> accepts or agrees to accept, anything of value from any
> person, intending to be influenced or rewarded in
> connection with any business, transaction, or series of
> transactions of such . . . government, or agency
> involving anything of value of $5,000 or more; or shall
> be fined . . ., imprisoned not more than 10 years, or
> both.

18 U.S.C. § 666(a)(1)(B).  The indictment tracked the

language of the statute, see Ind. at p. 40 ("corruptly

solicited and demanded for his own benefit anything of value

intending to be influenced and rewarded in connection with

business, a transaction, or series of transactions of the

City of Philadelphia"), as did the jury instruction, which

stated in part:

> To prove a bribery as charged in Counts Twenty-Three,
> Twenty-Four, and Twenty-Five, the Government must prove
> each of the following elements beyond a reasonable
> doubt, first, that the defendant was an agent of a
> local government, in this case, the City of
> Philadelphia; second, that the defendant solicited or
> demanded or accepted or agreed to accept anything of
> value from another person; third, that the defendant
> did so corruptly with the intent to be influenced or
> rewarded in connection with some business, transaction,
> or series of transactions of the City of Philadelphia;
> fourth, that this business transaction or series of
> transactions involved anything of value or $5,000 or

- 30 -

> more; and fifth, that the City of Philadelphia, that
> is, the local government, in a one-year period received
> benefits of more than $10,000 under any federal program
> involving a grant, contract, subsidy, loan, guarantee,
> insurance, or other assistance.

Tr. 38 (Mar. 16, 2006).

Thus, contrary to Mariano's brief assertion, the instructions directly presented the theory stated in the indictment, and did so accurately.[6]  What Section 666 proscribes is acceptance of a benefit "with the intent to be influenced or rewarded."  The statute therefore covers more than a quid pro quo exchange, and explicitly allows for a gratuity theory.  See Kemp, 500 F.3d at 281 (a gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken") (quoting United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404 (1999)).  See United States v. Crozier, 987 F.2d 893, 899 (2d Cir. 1993) ("we believe that the statute, like § 201 (which it was enacted to supplement), should be construed to include gratuities as well.").

---

[6]  The instructions are also consistent with the later issued Third Circuit model instructions.  See Third Cir. Model Crim. Jury Instruction 6.18.666A1B.

- 31 -

The Eleventh Circuit recently held that bribery convictions under section 666 do not require a specific quid pro quo.  United States v. McNair, 605 F.3d 1152 (11th Cir. 2010).  McNair involved a consolidated appeal arising from five bribery and public corruption cases relating to the $3 billion repair and rehabilitation of a sewer and wastewater treatment system in Jefferson County, Alabama.  Id. at 1164. The court affirmed the bribery convictions of several Alabama sewerage authority officials in a case in which the officials received cash and home improvements from contractors doing work with the state agency.  All of the appellants in McNair had requested jury charges that included a quid pro quo requirement, but the trial court did not provide them.

As McNair held, the statutory language plainly does not require "that a specific payment be solicited, received, or given in exchange for a specific official act." Id. at 1187-88.  The court noted that the requirement of a "corrupt" intent in Section 666 narrowed the conduct that violates Section 666 but did not impose a specific quid pro quo requirement.  The McNeil Court concluded:

- 32 -

> Simply put, the government is not required to tie or
> directly link a benefit or payment to a specific
> official act by that County employee.  The intent that
> must be proven is an intent to corruptly influence or
> to be influenced 'in connection with any business' or
> 'transaction,' not an intent to engage in any specific
> *quid pro quo*.

**Id.** at 1188.

This conclusion is also consistent with decisions of other courts.  See **United States v. Abbey**, 560 F.3d 513, 520 (6th Cir.), **cert. denied**, 130 S.Ct. 739 (2009) ("the text says nothing of a quid pro quo requirement to sustain a conviction" and "while a quid pro quo of money for a specific legislative act is sufficient to violate [§ 666(a)(1)(B) or (a)(2)], it is not necessary") (quotation marks omitted); **United States v. Gee**, 432 F.3d 713, 714-15 (7th Cir. 2005) (holding that "[a] quid pro quo of money for a specific legislative act" is not necessary under § 666(a)(1)(B) and that an exchange of money for the official's "influence" was enough); **United States v. Agostino**, 132 F.3d 1183, 1190 (7th Cir. 1997) ("We decline to import an additional, specific quid pro quo requirement into the elements of § 666(a)(2)."); **but see** **United States v. Jennings**, 160 F.3d 1006, 1014 (4th Cir. 1998) (concluding

the "corrupt intent" element in § 666 requires the
government to prove a quid pro quo, but stating the "*quid
pro quo* requirement is satisfied so long as the evidence
shows a 'course of conduct of favors and gifts flowing to a
public official in exchange for a pattern of official
actions favorable to the donor'" and "the intended exchange
in bribery can be 'this for these' or 'these for these,' not
just 'this for that'" (citations omitted)).

        Thus, it is clear that the instructions given by
this Court regarding bribery under Section 666 and the
definition of "corruptly" stated the correct legal standard
and this Court did not abuse its discretion in providing
these instructions.  As such, Mariano's counsel did not
provide ineffective assistance under <u>Strickland</u> since his
performance in not objecting to these instructions was not
deficient and thus could not prejudice Mariano.

        2.  Mariano next asserts that "[t]he jury was not
instructed that convictions of honest-services fraud and
bribery require evidence that Movant received a benefit with
the specific intent to exchange an official act for that
benefit, and was instead permitted to convict merely on

evidence that Movant knew that the payor offered the benefit with an intent to influence Movant." Mariano Summary at 5. As explained above, that is incorrect; the instructions employed language of the Supreme Court, in a form approved by the Third Circuit, to define the quid pro quo element of honest services bribery.

      3.  Finally, Mariano states, without any explication, that "[t]he jury was given an erroneous definition of the 'corruptly' element of bribery." Id. Again, he is in error. This Court gave the jury the following instruction regarding the definition of "corruptly":

> A person acts corruptly when that person voluntarily and intentionally acts at least in part with the understanding that something of value is given to reward or influence him in connection with his official duties. The Government need not prove that the defendant's motivation was entirely a corrupt one. It is sufficient that the defendant was partially motivated by the expectation of or a desire or reward.

Tr. 38 (Mar. 16, 2006).

      The instruction is simply an adaptation of standard instructions that appear in the Modern Federal Jury Instructions supplemented by case law. See 1-27A Modern Federal Jury Instructions-Criminal § 27A.02; United States

- 35 -

v. Coyne, 4 F.3d 100, 113 (2d Cir. 1993) (district court was entirely appropriate in instructing the jury that the government must prove beyond a reasonable doubt that "the defendant accepted or solicited the thing of value, at least in part, for or because of his conduct or intending to be influenced in connection with any business or transaction of Albany County."); United States v. Biaggi, 909 F.2d 662, 683 (2d Cir. 1990) ("[A] valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability."). The instruction stated the proper legal standard and Mariano's baseless argument to the contrary must fail.[7]

> **E.    Mariano is Not Entitled to a New Trial on the Honest Services Charges.**

Finally, we presume that Mariano will pursue a claim for a new trial on the charges of honest services fraud, based on the new intereptation in Skilling limiting

---

[7]    It is also notable that the instructions as a whole conveyed the necessary requirement that the jury find that Mariano acted wrongfully. While he now objects for the first time to a portion of the charge, it bears observation that "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

the statute to bribery or kickbacks.  Here, the jury was
instructed that it could convict based either on the (still
valid) bribery theory or on the (now invalid) conflict-of-
interest theory.  For a number of reasons, however, in the
posture of this case on collateral review, Mariano is not
entitled to relief.

        1.   <u>Mariano Procedurally Defaulted the Claim</u>.

      Mariano did not previously challenge the
presentation of the conflict-of-interest theory to the jury,
and therefore he may not due so now.  If a defendant failed
to raise an issue before the trial court, or presented the
claim but then abandoned it and did not include it in a
direct appeal, the issue is deemed "defaulted" and may not
be raised under Section 2255 except under unusual
circumstances which are not present here.  In sum, "a prior
opportunity for full and fair litigation is normally
dispositive of a federal prisoner's habeas claim.  If the
claim was raised and rejected on direct review, the habeas
court will not readjudicate it absent countervailing
equitable considerations; if the claim was not raised, it is
procedurally defaulted and the habeas court will not

adjudicate it absent countervailing equitable considerations
(e.g., actual innocence or cause and prejudice, see United
States v. Frady, 456 U.S. 152 (1982))."  Withrow v.
Williams, 507 U.S. 680, 720-721 (1993) (Scalia, J.,
concurring).

        The law requires that a defendant bring all of his
claims, even constitutional claims, before the trial court
and on direct appeal, or he is barred from raising them on
collateral review.  "So far as convictions obtained in the
federal courts are concerned, the general rule is that the
writ of habeas corpus will not be allowed to do service for
an appeal."  Sunal v. Large, 332 U.S. 174, 178 (1947).

        In Sunal, the petitioners were convicted of
refusing to submit for induction to the military.  At trial,
consistent with all lower court opinions at the time, the
trial courts refused to entertain as a defense the
petitioners' challenge to selective service regulations.
Neither appealed.  Subsequently, the Supreme Court held that
the defense in fact should be allowed in such cases.  In
Sunal, the Court held that a writ of habeas corpus was not
available to the petitioners.  The Court acknowledged some

- 38 -

exceptions to the waiver rule, but held that those

exceptions are very limited.  Id. at 178-79.

> Of course, if Sunal and Kulick had pursued the
> appellate course and failed, their cases would be quite
> different.  But since they chose not to pursue the
> remedy which they had, we do not think they should now
> be allowed to justify their failure by saying they
> deemed any appeal futile.

Id. at 181.

> We are dealing here with a problem which has radiations
> far beyond the present cases.  The courts which tried
> the defendants had jurisdiction over their persons and
> over the offense.  They committed an error of law in
> excluding the defense which was tendered.  That error
> did not go to the jurisdiction of the trial court.
> Congress, moreover, has provided a regular, orderly
> method for correction of all such errors by granting an
> appeal to the Circuit Courts of Appeals and by vesting
> us with certiorari jurisdiction.  It is not uncommon
> after a trial is ended and the time for appeal has
> passed to discover that a shift in the law or the
> impact of a new decision has given increased relevance
> to a point made at the trial but not pursued on appeal.
> . . . If in such circumstances, habeas corpus could be
> used to correct the error, the writ would become a
> delayed motion for a new trial, renewed from time to
> time as the legal climate changed.  Error which was not
> deemed sufficiently adequate to warrant an appeal would
> acquire new implications.  Every error is potentially
> reversible error; and many rulings of the trial court
> spell the difference between conviction and acquittal.
> If defendants who accept the judgment of conviction and
> do not appeal can later renew their attack on the
> judgment by habeas corpus, litigation in these criminal
> cases will be interminable.  Wise judicial
> administration of the federal courts counsels against
> such course, at least where the error does not trench

on any constitutional rights of defendants nor involve
the jurisdiction of the trial court.

Id. at 181.

        Under present law, a defendant who failed to raise
an issue at trial or on direct appeal may pursue the claim
under Section 2255 only if he demonstrates sufficient
"cause" for the default and "prejudice" resulting from it.
Bousley v. United States, 523 U.S. 614, 622 (1998).

        Mariano will likely contend that there is cause
for his default, on the grounds that the Skilling opinion
was not available to him at the time of trial or appeal, or
because his counsel was ineffective for failing to pursue
the Skilling argument.  If that fails, the defendant will
try to take advantage of the one exception to the cause and
prejudice requirement; the Supreme Court has acknowledged
that even a defaulted claim may be raised under Section 2255
if the defendant shows his "actual innocence" of his
offense.  But in this case, all of these arguments fail.

        a.   Cause based on change in law.

        One possible attempt to establish cause will be an
argument that Skilling represented a change in the law which
the defendant could not have anticipated at the time of

trial or appeal.  However, a defendant cannot show cause for failing to raise the argument earlier simply because the new decision was unavailable and arguably represented a change in Third Circuit law.

The Supreme Court has held that cause for failure to raise an issue exists "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel."  Reed v. Ross, 468 U.S. 1, 16 (1984) (challenge to jury instruction which had been used in state without challenge for a century).  However, this explanation is permitted only where counsel was foreclosed from raising the issue earlier; where the argument was permissible, even if likely futile, cause has not been established.

That is the import of Engle v. Isaac, 456 U.S. 107 (1982).  There, the defendants did not object at trial to the court's jury instruction that a defendant bore the burden of proving self-defense by a preponderance of the evidence, a proposition later rejected by a state supreme court ruling.  The Supreme Court held that the claim was defaulted and could not be raised on habeas.  It ruled that the default was not excused by the likelihood that the claim

would have been rejected; where it "cannot [be said] that
respondents lacked the tools to construct their
constitutional claim," id. at 133, there is no basis for the
default, id. at 132-33.  The Court held that the fact that
other attorneys raised the claim at the same time
demonstrated that the argument was allowed, even if unlikely
to succeed.  "Even those decisions rejecting the defendant's
claim, of course, show that the issue had been perceived by
other defendants and that it was a live one in the courts at
the time."  Id. at 133 n.41.  The Court concluded:  "Where
the basis of a constitutional claim is available, and other
defense counsel have perceived and litigated that claim, the
demands of comity and finality counsel against labeling
alleged unawareness of the objection as cause for a
procedural default."  Id. at 134.

     Similarly, Murray v. Carrier, 477 U.S. 478 (1986),
held that competent counsel's inadvertence in not presenting
a claim on appeal is not cause for default.  "[T]he mere
fact that counsel failed to recognize the factual or legal
basis for a claim, or failed to raise the claim despite

recognizing it, does not constitute cause for a procedural
default."  Id. at 486.

        Here, the Skilling issue was certainly available
prior to the time that decision was announced, as evident
from the fact that the defendants in Skilling and numerous
other cases pressed it at the same time.  Thus, the mere
fact that counsel may have overlooked or disdained the issue
does not constitute cause for default.  The tools were
available to construct the argument which prevailed in
Skilling.

        Smith v. Murray, 477 U.S. 527 (1986), is also on
point.  There, the Supreme Court held that the defendant
defaulted a claim by not raising it on direct appeal.  "The
basis for that decision was counsel's perception that the
claim had little chance of success in the Virginia courts.
With the benefit of hindsight, petitioner's counsel in this
Court now contends that this perception proved to be
incorrect."  Id. at 534.  The Court held that the petitioner
could not rely on the novelty of the claim:  "as a
comparison of Reed and Engle makes plain, the question is
not whether subsequent legal developments have made

counsel's task easier, but whether at the time of the default the claim was 'available' at all.  As petitioner has candidly conceded, various forms of the claim he now advances had been percolating in the lower courts for years at the time of his original appeal." Id. at 537.  See also Bousley v. United States, 523 U.S. 614 (1998) (challenge to interpretation of 18 U.S.C. § 924(c)(1), prior to the Court's decision in Bailey v. United States, 516 U.S. 137, 1611 (1995), was likely futile, but was available).

Because the Skilling issue was available to counsel prior to the announcement of that decision, the novelty of the claim does not provide cause for failure to raise it.

> b.    Cause based on ineffective assistance of counsel.

A defendant may also argue cause for his procedural default on the grounds that his trial or appellate counsel was ineffective for failing to press the issue.  Ineffective assistance may represent the cause to justify the petitioner's earlier default of an issue. United States v. Garth, 188 F.3d 99, 107 (3d Cir. 1999); United States v. Sanders, 165 F.3d 248, 250 (3d Cir. 1999).

As stated above, the issue was available, and accordingly the novelty of the issue does not provide cause for failing to raise it.  But on the other hand, prior to Skilling the weight of authority militated against the challenge and counsel accordingly cannot be deemed constitutionally ineffective for failing to pursue it.

It is common for courts to rule that while an issue was not so novel that there was cause for the defendant to omit it under the procedural default test, the issue was sufficiently unusual or unlikely to succeed that counsel's decision not to raise it or oversight in not perceiving it cannot be held to fall outside the broad range of constitutionally satisfactory representation.  For instance, as discussed above, in Smith v. Murray, 477 U.S. 527, 535-36 (1986), the Court held that counsel's failure to recognize the significance of a claim supported by later case law was not cause for procedural default, but moreover this inadvertence did not demonstrate constitutionally ineffective assistance of counsel, either.

The Supreme Court stated:

> After conducting a vigorous defense at both the guilt
> and sentencing phases of the trial, counsel surveyed

the extensive transcript, researched a number of
claims, and decided that, under the current state of
the law, 13 were worth pursuing on direct appeal.  This
process of "winnowing out weaker arguments on appeal
and focusing on" those more likely to prevail, far from
being evidence of incompetence, is the hallmark of
effective appellate advocacy.  <u>Jones v. Barnes</u>, 463
U.S. 745, 751-752 (1983).  It will often be the case
that even the most informed counsel will fail to
anticipate a state appellate court's willingness to
reconsider a prior holding or will underestimate the
likelihood that a federal habeas court will repudiate
an established state rule.  But, as <u>Strickland v.
Washington</u> made clear, "[a] fair assessment of attorney
performance requires that every effort be made to
eliminate the distorting effects of hindsight, to
reconstruct the circumstances of counsel's challenged
conduct, and to evaluate the conduct from counsel's
perspective at the time."  466 U.S., at 689.  Viewed in
light of Virginia law at the time Mr. Pugh submitted
his opening brief to the Supreme Court of Virginia, the
decision not to pursue his objection to the admission
of Dr. Pile's testimony fell well within the "wide
range of professionally competent assistance" required
under the Sixth Amendment to the Federal Constitution.
<u>Id</u>., at 690.

477 U.S. at 535-36.[8]

---

[8]   <u>See also</u> <u>Duncan v. Morton</u>, 256 F.3d 189, 202-03 (3d
Cir. 2001) (failure to object to jury instruction was not
ineffective assistance of counsel where controlling law was
not decided until after the trial, although earlier state
Supreme Court decisions pointed in that direction); <u>United
States v. Mikalajunas</u>, 186 F.3d 490, 493 (4th Cir. 1999)
(with respect to sentencing enhancement, court held that
"[c]ounsel's failure to pursue a basis for appeal by reason
of a mere miscalculation of the likelihood of success does
not constitute constitutionally ineffective
representation."); <u>Pollard v. White</u>, 119 F.3d 1430, 1436
(9th Cir. 1997) (counsel not ineffective in asserting the
"better view" of the law at the time, "although the issue

With regard to honest services fraud, the Third
Circuit in 2002 in <u>Panarella</u> exhaustively considered the
viability of and endorsed the conflict-of-interest theory.
No appellate court disagreed.  Counsel was therefore not
ineffective in abiding by that holding and not pressing the
issue.

The correct result -- a conclusion that the
<u>Skilling</u> claim was sufficiently novel and uncertain to allow
counsel's decision not to raise it, but not so unavailable
to establish cause for the failure to present it -- rests on
fundamental principles limiting habeas review.  The Supreme
Court has repeatedly emphasized that the habeas remedy is
extraordinary, and will not be allowed to replace the

was not entirely clear"); <u>United States v. Gaudet</u>, 81 F.3d
585, 591 (5th Cir. 1996) (counsel was not ineffective for
not presenting argument at sentencing because of his
assessment of the law; claim of ineffectiveness cannot be
based on subsequent judicial decision which had not yet been
announced); <u>Horne v. Trickey</u>, 895 F.2d 497, 500 (8th Cir.
1990) ("In effect, Horne argues that his counsel should have
realized that the Supreme Court was planning a significant
change in the existing law, and that the failure to
anticipate this change rises to the level of constitutional
ineffectiveness.  We repeatedly have been unwilling to hold
attorneys to such a high standard."); <u>Brunson v. Higgins</u>,
708 F.2d 1353, 1358 (8th Cir. 1983) (counsel not ineffective
for failing to raise challenge to jury panel which was
speculative based on case law at the time, even if other
attorneys were raising the issue).

appeals process, lest the interest in finality in criminal prosecutions be thwarted.  See, e.g., Engle v. Isaac, 456 U.S. 107, 126 (1982); United States v. Addonizio, 442 U.S. 178, 184 (1979).  The procedural default analysis in this case is consistent with this principle.  The defendant was convicted and sentenced in a proceeding in which all prevailing norms and constitutional rules were followed, and he was represented by able counsel.  Subsequent changes in the law which do not expose a miscarriage of justice in his case should not be recognized, given the overriding demand for finality in the prosecution of criminal offenders.  Id.

### c.  Actual innocence.

If a defendant fails to establish cause for procedural default, there is no reason to address the prejudice prong of the default standard.  However, the Supreme Court has defined a very limited exception to the default rule, providing for habeas consideration even where there is no cause for the default if the petitioner establishes that he is "actually innocent" of the offense for which he was convicted.  Bousley v. United States, 523 U.S. 614, 622 (1998).  "[I]n an extraordinary case, where a

constitutional violation has probably resulted in the
conviction of one who is actually innocent, a federal habeas
court may grant the writ even in the absence of a showing of
cause for the procedural default."  Murray v. Carrier, 477
U.S. 478, 496 (1986).

    In Bousley, the defendant pled guilty to "using" a
firearm "during and in relation to a drug trafficking
crime," in violation of 18 U.S.C. § 924(c)(1).
Subsequently, while his appeal was pending, the Supreme
Court held that a conviction under this statute required the
government to prove "active employment of the firearm,"
Bailey v. United States, 516 U.S. 137, 144 (1995), not its
mere possession.  The Bousley Court considered the
defendant's 2255 petition, and applied the procedural
default rule, but held that the default could be excused if
the defendant demonstrated that he was "actually innocent"
of the offense under the new definition.  The Court
declared:

> To establish actual innocence, petitioner must
> demonstrate that, "'in light of all the evidence,'" "it
> is more likely than not that no reasonable juror would
> have convicted him."  Schlup v. Delo, 513 U.S. 298,
> 327-328 [] (1995) (quoting Friendly, Is Innocence

Irrelevant? Collateral Attack on Criminal Judgments, 38
U. Chi. L. Rev. 142, 160 (1970)).

* * *

It is important to note in this regard that "actual
innocence" means factual innocence, not mere legal
insufficiency. <u>See</u> Sawyer v. Whitley, 505 U.S. 333,
339 [] (1992). In other words, the Government is not
limited to the existing record to rebut any showing
that petitioner might make. Rather, on remand, the
Government should be permitted to present any
admissible evidence of petitioner's guilt even if that
evidence was not presented during petitioner's plea
colloquy and would not normally have been offered
before our decision in <u>Bailey</u>.

<u>Bousley</u>, 523 U.S. at 623-24. Thus, the Supreme Court held,

in order to seek habeas relief the petitioner must

demonstrate "that he did not 'use' a firearm as that term is

defined in <u>Bailey</u>." <u>Id.</u> at 624.

As applied to honest services fraud, this ruling

provides that if a defendant were only charged with the

conflict-of-interest theory, and no evidence showed his

guilt under a valid theory, the government would readily

agree that the defendant was "actually innocent" and should

receive relief. However, it is the defendant's burden to

establish innocence of the crime under the interpretation of

the Supreme Court, and this Mariano cannot do. <u>Skilling</u>

affirmed the bribery theory of honest services fraud which

was also charged in this case, and the Third Circuit earlier found sufficient evidence supporting the theory.

On direct appeal, the Court of Appeals found that the government advanced the bribery theory as well as the conflict-of-interest theory, and that the evidence of bribery was sufficient to permit the jury to find Mariano guilty beyond a reasonable doubt. <u>United States v. Mariano</u>, 316 Fed. Appx. 99, 102 (3d Cir. 2008).[9] Thus, it is impossible for Mariano to demonstrate that he is "actually innocent," that is, that "'in light of all the evidence,'"

_____

[9] Along the same lines, the Court rejected Mariano's challenge to the sentencing court's determination that his offense involved multiple bribes.

[T]he evidence demonstrated that each of Chartock's payments to Mariano were made in close proximity to Mariano taking some distinct action on behalf of Erie Steel.  The first payment occurred within four days of Mariano contacting Air Management Services.  The second payment occurred approximately two weeks before Mariano contacted Dougherty about the KOZ program and Erie Steel's eligibility for it.  Finally, the third payment occurred three weeks after Mariano met with Dougherty and Chartock, and only two weeks after Mariano received a fax from Louis Chartock requesting Mariano's further assistance in the KOZ program matters.  Thus, the District Court's finding that the payments were separate payments made under different circumstances, and thus were separate bribes, was not clearly erroneous.

<u>Id.</u> at 103.

"it is more likely than not that no reasonable juror would have convicted him."  Bousley, 523 U.S. at 623 (citation omitted).  In essence, the Third Circuit has already rejected the proposition that Mariano may assert actual innocence under the bribery theory, in light of its finding that the government presented sufficient evidence of that theory to allow jurors to find guilt beyond a reasonable doubt.

        This result is consistent with the fact that, as explained earlier, habeas relief is extraordinary, and is limited to situations in which a miscarriage of justice has occurred, such as through the conviction of an innocent person.[10]  Mariano cannot establish that "no reasonable

_____

        [10]  In one of many similar statements, the Supreme Court observed:

    [T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fairness.'" Engle v. Isaac, 456 U.S. 107, 126 [] (1982) (quoting Wainwright v. Sykes, [433 U.S. 72, 97 (1977)] (STEVENS, J., concurring)).  "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation."  Fay v. Noia, 372 U.S. 391, 440-441 [] (1963).

Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993).

juror" could find him guilty under the valid bribery theory
offered at trial, and therefore he cannot establish actual
innocence and may not seek habeas relief.

    2.    Mariano is Not Entitled to Relief on the
          Merits.

    If the claim were not procedurally defaulted
(which it is), Mariano's challenge would be subject to
review for harmless error.  In Skilling, the Court stated:

> Because the indictment alleged three objects of the
> conspiracy - honest-services wire fraud,
> money-or-property wire fraud, and securities fraud -
> Skilling's conviction is flawed.  See Yates v. United
> States, 354 U.S. 298 [] (1957) (constitutional error
> occurs when a jury is instructed on alternative
> theories of guilt and returns a general verdict that
> may rest on a legally invalid theory).  This
> determination, however, does not necessarily require
> reversal of the conspiracy conviction; we recently
> confirmed, in Hedgpeth v. Pulido, [] 129 S.Ct. 530 []
> (2008) (per curiam), that errors of the Yates variety
> are subject to harmless-error analysis.

Skilling, 130 S. Ct. at 2934.

    Hedgpeth stated that instruction on an invalid
theory of liability is not structural error, but is subject
to harmless error review on collateral review, under the
test stated in Brecht v. Abrahamson, 507 U.S. 619 (1993).[11]

_____

    [11]  As Brecht explained at length, the standard on
collateral review is less onerous than the harmless error
standard applicable on direct appeal, where the standard for

- 53 -

The question is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637.

     For the same reasons discussed earlier, Mariano cannot meet this burden. The evidence of bribery was exceptionally strong, and thus there is every reason to conclude that the jury would have convicted him of honest services fraud if instructed of the bribery theory alone. Mariano cannot meet his burden of showing prejudice, and thus a claim for a new trial would fail even on the merits.

---

determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." See Chapman v. California, 386 U.S. 18, 24 (1967).

IV.  <u>CONCLUSION</u>.

     For all of the foregoing reasons, the government respectfully submits that the defendant's motion for relief under Section 2255 should be denied.

                         Respectfully submitted,

                         ZANE DAVID MEMEGER
                         United States Attorney

                         <u>/s Robert A. Zauzmer</u>
                         ROBERT A. ZAUZMER
                         Assistant United States Attorney
                         Chief of Appeals

                         <u>s/ Maria M. Carrillo</u>
                         MARIA M. CARRILLO
                         Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the government's government's response to the defendant's motion under 28 U.S.C. § 2255 has been served by electronic filing and electronic email upon:

David Kozlow, Esquire
Assistant Federal Defender
601 Walnut Street, Suite 540 West
Philadelphia, PA  19106
david_kozlow@fd.org


s/ Maria M. Carrillo
MARIA M. CARRILLO
Assistant United States Attorney


Dated:  August 6, 2010.